Union Packing Company et al. [1] v. Commissioner. Union Packing Co. v. Commissioner
Docket Nos. 29579, 29099-29105, 29580-29587, 32709-32714, 45704.
United States Tax Court
T.C. Memo 1955-308; 1955 Tax Ct. Memo LEXIS 29; 14 T.C.M. (CCH) 1188; T.C.M. (RIA) 55308; November 22, 1955
*29 Packing, a corporation engaged in meat packing, owned two subsidiaries, Feed Yards, operating a cattle feeding yard, and Stock Farms, operating a feed yard and farm. The president of Packing owned 57 per cent of its stock and controlled the business of the three corporations. His sons, who were not stockholders until late 1947, took part in the operations. The president authorized collection of overceiling prices on meat sold and cash was collected and divided by his sons or given to other employees without being recorded on Packing's books. The president retained for himself or gave to a nephew profits realized on sales of Stock Farms' wheat. One son became a partner in a partnership operating a feed yard and a meat canning business, and was a licensed dealer in wholesale feeds. Another son was employed by Packing as a cattle buyer and retained profits made on some purchases and sales. Later he left the employ of Packing to go into business as a buyer and seller of cattle. Stock Farms expended sums for levelling farm land for irrigation and for repairing cattle corrals, paid a salary to a nephew of the president while in the Army, and furnished work clothing to a member of the partnership *30 operating the feed yard. Packing paid salary to an inactive minority stockholder, expended amounts on major repairs to plant and claimed deductions for additions to bad debt reserve and loss on sale of land. A corporation taking over the cannery operation from a partnership claimed deductions for expenses and repairs. Sons of president paid attorneys' fees in connection with prosecution for violations of price ceilings. Held: 1. Overceiling collections were income of Packing. 2. Amount of overceiling collections determined. 3. Feed yard and canning operations were conducted by bona fide partnerships and income therefrom is not income to Packing. 4. Profits on cattle transactions retained by president's son while employed by Packing were income to Packing; profits made after leaving employ were not.
5. Amount of deductible land levelling expense determined. 6. Deductions allowed for repairs to corral fences. 7. Deductions not allowed for salaries paid by Stock Farms to nephew of president and by Packing to inactive stockholder, clothing furnished, major repairs, additions to bad debt reserve, loss on land sale or attorneys' fees. 8. Disallowance of deductions for expenses *31 and repairs by canning corporation is not shown to be erroneous. 9. Stock Farms made constructive distributions to Packing. 10. Overceiling collections and income constructively received by Packing were constructive distributions by Packing to president. 11. Returns of corporations and president were not fraudulent. George Bouchard, Esq., Statler Center, Los Angeles, Calif., Benjamin W. Shipman, Esq., and Ernest R. Utley, Esq., for the petitioners. Donald P. Chehock, Esq., and George E. Constable, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in taxes of the petitioners, as follows: Docket No.
Year
Tax
Deficiency
50% Penalty
Union Packing Company
29579
1942
D.V.E.P.
$ 1,685.34
$ 842.67
29579
1942
Excess Profits
39,393.27
19,696.64
29579
1943
D.V.E.P.
27,242.04
13,621.02
29579
1943
E.P.
266,544.38
133,272.19
29579
1943
Income
6,490.29
3,245.15
29579
1944
D.V.E.P.
14,391.54
7,195.77
29579
1944
E.P.
176,086.92
88,043.46
29579
1944
Income
10,601.84
5,300.92
29579
1945
D.V.E.P.
44,083.02
22,041.51
29579
1945
E.P.
280,752.86
140,376.43
29579
1945
Income
12,305.60
6,152.80
45704
1946
Income
17,038.89
32711
1947
Income
112,318.84
56,159.42
Union Feed Yards, Inc.
FY
29581
10/31/44
D.V.E.P.
$ 4,112.02
$ 2,056.01
29581
10/31/44
E.P.
20,689.93
10,344.97
29581
10/31/44
Income
2,714.75
1,357.38
29581
10/31/45
D.E.V.P.
6,600.93
3,300.47
29581
10/31/45
E.P.
29,960.52
14,980.26
29581
10/31/45
Income
3,110.20
1,555.10
29100
10/31/46
Income
1,993.20
996.60
32713
10/31/47
Income
54,087.24
27,043.62
Union Stock Farms
29580
1944
D.V.E.P.
$ 5,807.58
$ 2,903.79
29580
1944
E.P.
51,886.03
25,943.02
29580
1944
Income
555.79
277.90
29580
1945
D.V.E.P.
4,035.79
2,017.90
29580
1945
E.P.
70,278.19
35,139.10
29099
1946
Income
21,061.33
10,530.67
32712
1947
Income
5,749.94
2,874.97
Best-Ever Packing Company
FY
32714
1/31/47
Income
$ 22,434.36
$ 11,217.18
Adolph Miller
29582
1943
Income & Victory
$246,000.49
$123,000.25
29582
1944
Income
205,201.20
102,600.60
29582
1945
Income
185,132.14
92,566.07
29101
1946
Income
218,606.54
109,303.27
32709
1947
Income
277,629.82
138,814.91
Pauline Miller
29583
1943
Income & Victory
$112,242.62
$ 56,121.31
29583
1944
Income
91,748.29
45,874.15
29583
1945
Income
81,304.89
40,652.45
32710
1947
Income
128,812.26
64,406.13
Nathan Miller
29584
1943
Income & Victory
$ 43,154.91
$ 21,577.46
29584
1944
Income
16,525.93
8,262.97
29584
1945
Income
15,541.60
7,770.80
29102
1946
Income
1,825.78
Leona Miller
29585
1943
Income & Victory
$ 43,244.21
$ 21,622.10
29585
1944
Income
16,620.94
8,310.47
29585
1945
Income
15,541.60
7,770.80
29103
1946
Income
1,825.79
benjamin Miller
29586
1943
Income & Victory
$ 42,882.30
$ 21,441.15
29586
1944
Income
17,008.24
8,504.12
29586
1945
Income
14,695.82
7,347.91
29104
1946
Income
1,381.59
Sylvia Miller
29587
1943
Income & Victory
$ 42,972.16
$ 21,486.08
29587
1944
Income
17,077.32
8,538.66
29587
1945
Income
14,695.83
7,347.92
29105
1946
Income
1,381.58
*32 These consolidated cases present several issues. The respondent concedes on brief the issues involved in the additions to tax for fraud in the cases of Pauline Miller, Sylvia Miller and Leona Miller, and Best-Ever Packing Company. The respondent concedes error in adding to the income of Union Packing Company a profit of $95,091.68 realized by Nathan and Benjamin Miller from a real estate transaction in 1947, and concedes the issues relative to the disallowance of deductions for salary paid Adolph Miller by Union Stock Farms in 1945, 1946 and 1947, and in the determination that payment by Best-Ever Packing Company of a salary to Benjamin Miller, its president, of $5,680 in the fiscal year ended in 1947 represented a dividend to Union Packing Company. The issues remaining for decision are (1) whether certain overceiling amounts collected based upon meat sold by Union Packing Company constituted income to the corporation, (2) what were the amounts of such collections, (3) whether profits of a feed yard operation were taxable to Union Feed Yards, Inc., (4) whether profits of certain meat canning operations were taxable to Union Packing Company, (5) whether profits of various cattle *33 sales or purchases retained by Nathan Miller and persons associated with him were taxable as income to Union Packing Company, (6) whether respondent's adjustments in the case of Union Stock Farms were correct in disallowing a salary paid and cost of certain clothing furnished, in adding to income profit from sales of wheat and of citrus pulp, and in capitalizing amounts expended for land levelling and corral fencing, (7) whether certain items should be treated as constructive distributions from Union Stock Farms or Union Feed Yards to Union Packing Company and from the latter to its principal stockholder, (8) whether deductions claimed by Union Packing Company for amounts paid as salary to an inactive stockholder, major repairs, an addition to reserve for bad debts and loss on a sale of land were allowable, (9) whether the respondent erred in disallowing deductions claimed by Best-Ever Packing Company for expenses and repairs, (10) whether certain attorneys' fees paid were deductible by Nathan and Benjamin Miller, and (11) whether respondent was correct in determining additions to tax for fraud as to Adolph Miller, Nathan Miller, Benjamin Miller, Union Packing Company, Union Stock *34 Farms and Union Feed Yards, Inc. The returns of all the taxpayers were filed with the collector of internal revenue at Los Angeles, California. A partial stipulation of facts was filed. Findings of fact pertaining to particular issues will be stated under separate headings and the opinion on the same issues will be stated under similar headings. Findings of Fact General Facts The stipulated facts are so found and the stipulation is incorporated by this reference. Petitioner Adolph Miller, sometimes herein referred to as Adolph, was born in Austria in 1892. He came to the United States in 1910. Beginning in 1917 or 1918 he bought cattle for slaughter and sold the meat. In 1922 Adolph Miller, August Vogel and Joe Born organized the Union Packing Company, a corporation, sometimes hereinafter referred to as Packing, each having an equal interest. Later Glen Shivel was employed by Packing and acquired an interest in the corporation. In 1928 Adolph Miller and Glen Shivel bought out the others. Adolph has since held a 57 per cent interest. Shivel held a 43 per cent interest until his death in December 1940. His widow, Hazel Shivel, held the same interest thereafter until September *35 1947 when she sold it to Nathan, Benjamin and Robert Miller. Adolph married petitioner Pauline Miller in 1913. They had three sons and a daughter. Their son, petitioner Nathan Miller, sometimes herein referred to as Nate, was born in 1914. Their son, petitioner Benjamin Miller, sometimes herein referred to as Ben, was born in 1917. Robert Miller, sometimes herein referred to as Robert, is a nephew of Adolph who was cared for by Adolph and Pauline from an early age. Robert was born in 1915. Petitioner Leona Miller is the wife of Nate. Petitioner Sylvia Miller is the wife of Ben. Union Feed Yards, Inc., sometimes herein referred to as Feed Yards, is a corporation organized in December 1937. Its stock is wholly owned by Packing. Feed Yards leased property at Bassett, some 17 miles from Packing's plant, and prior to November 1943 was engaged in the operation of feeding cattle for Packing and other cattle owners. Feed Yards did not own cattle. Union Stock Farms, sometimes herein referred to as Stock Farms, is a corporation organized in July 1940. Its stock is wholly owned by Packing. It was engaged in the feeding of cattle and growing of feed on land near Blythe, Claifornia, about *36 230 miles from Packing's plant. Cattle were usually kept and fed at Bassett in the summer and at Blythe in the winter. Adolph Miller has been president of Packing, Feed Yards and Stock Farms at all times since organization of these corporations. No stockholders' or directors' meetings were held by stockholders or directors of these three corporations during the taxable years 1942 to 1947. No formal dividends were declared by any of them during this period. During the taxable years 1942 to 1947 Adolph Miller had general supervision of the business of Packing and of Union Stock Farms. Nathan Miller was employed by Packing as a cattle buyer during the years 1942, 1943 and 1944 and until September 1, in 1945. Hazel Shivel took no active part in the operations or management and was not consulted as to corporate matters. Ben Miller was employed as assistant superintendent and purchasing agent by Packing from 1940 until May 1943. In January 1945 and thereafter he was employed as sales manager for Packing. Ray Latimer entered the employ of Packing in 1935 or 1936. Upon Shivel's death in 1940 Latimer was made sales manager. He served in that capacity until he left the company at the end *37 of December 1944. George Epstein was secretary-treasurer of Packing and in charge of the office and credits. John Hachten was employed by Packing as plant superintendent from February 1, 1943 until February 1948 at a salary of $5,200 per year. Neil Leising was employed by Packing from about 1934 until October 1947 except for a brief period in 1945. He was a salesman and worked under Latimer in 1943 and 1944 and under Ben Miller thereafter. Adolph was one of three West Coast men appointed on a beef advisory committee for the Office of Price Administration, herein referred to as the O.P.A. He attended meetings of that committee held in Washington, D.C.
The corporation income tax returns filed by Packing for the calendar years 1943, 1944 and 1945 showed among other items: 1943
1944
1945
Gross sales
$6,171.221.21
$6,445,937.16
$7,814,187.39
Gross profit from sales
296,908.62
325,130.35
265,773.35
Net income
51,126.38
52,189.79
63,377.67
Closing inventory
782,148.12
831,889.53
148,919.38
Billed on Gov't contracts
1,700,000.00
2,000,000.00
none
Overceiling Collections During 1943, 1944 and until the fall of 1945 price ceilings fixed *38 under Federal law by the O.P.A. were in effect upon meat. Packers were required to set aside certain quotas of meat for the Government for the use of the Army or Navy. Subsidies were paid by the Government through Defense Supplies Corporation to processors. Processors making claim for subsidies were required to certify that their prices conformed to the ceiling prices fixed according to law. Packing set aside quotas of meat for Government use, claimed subsidies for meat processed and billed its civilian customers for meat at ceiling prices. Packing received subsidies in the period June 1943 to April 1946 amounting to $2,448,491.23. Late in 1942 and early in 1943 there was a substantial shortage of meat in the Los Angeles area and Packing was unable to supply all the demands of its customers. Starting in about April 1943 overceiling prices for meat were charged to and collected from its customers. At first the overcharge was ten per cent of the invoiced ceiling prices. Later the overcharge was based upon the pounds of meat delivered to the customers. Packing billed the customers at ceiling prices and received payment for such billings usually by check. The overceiling payments were *39 made weekly by the customers in currency placed in envelopes and handed usually to Latimer or Nate Miller. Nate Miller took charge of the money collected. The envelopes were opened and the money counted each week in offices of Packing. From the proceeds Nate distributed $100 each to Latimer, Epstein, Ben and himself, made some other payments to Latimer and divided the remainder between Ben and himself. No part of this money was recorded on the books of Packing. Collections were made from about 90 per cent of the civilian customers. The rate of overcharge was at first from two cents to four cents per pound and later in 1945, five cents per pound and in some cases six to eight cents. The larger chain stores did not pay overceilings but smaller chains and retail markets did. In some instances customers refused to pay and found their supply stopped. At the end of 1944 Latimer left the company and Ben Miller became sales manager. Collection of the overceiling amounts continued until about April 1, 1945, when the practice was terminated. At that time Nate and Ben made agreements with certain civilian customers who operated retail meat markets for a sharing of their profits. These arrangements *40 were in effect from April 1945 to October 1945 when price controls came to an end and the arrangements were terminated. A typical agreement reads as follows: "PARTNERSHIP AGREEMENT "THIS AGREEMENT OF PARTNERSHIP entered into this 30 day of April, 1945, in duplicate original by and between SAM WILKINS hereinafter referred to as 'First Party,' and Nathan Miller and Benjamin Miller, hereinafter referred to as 'Second Parties,' under and subject to the following terms and conditions: "1. The partnership shall engage in the retail meat business and shall conduct a meat market at 4404 S. Western Ave., Los Angeles, and 14617 Hawthorne Blvd., Laundale and such other locations as may be mutually agreed upon by the parties hereto, in writing. "2. The partnership shall operate under the name of WILKINS FINER MEATS and such additional names as the parties hereto may mutually agree upon in writing. "3. The partnership shall commence as of the beginning of business on April 30, 1945 and shall continue until dissolved in accordance with the terms of this agreement. "4. It is agreed that either party to this agreement may dissolve the partnership by serving one week's notice in writing *41 of intention to do so to the other party to this agreement at any time prior to the close of business of any month during the life of this agreement, such dissolution to be effective as of the close of business of the month specified in such notice. "5. The First Party shall invest in the partnership MERCHANDISE at an agreed valuation of $700.00. The Second Parties shall invest in the partnership the sum of $700.00. "6. All deposits shall be made in a bank designated by the parties to this agreement under the name of the partnership. $"7. First Party shall receive as a weekly salary the sum of $100.00. Second Parties shall receive as weekly salaries the sum of $25.00. "8. The net profits which for the purpose of this agreement are deemed to be such amounts as remain after the payment of all expenses of the partnership business, including depreciation and the salaries of the parties to this agreement set out above, shall be divided and paid out by the partnership to the parties to this agreement within ten days after the last day of each month during the term of this agreement. These net profits shall be divided in the following manner: 50% to First Party. 50% to Second *42 Parties. "9. First Party shall devote his entire time to the operation of the partnership business. Second Parties shall supervise the partnership business and establish the policies of said business. "10. In the event of the dissolution of this partnership each party of this agreement shall receive his interest in the partnership assets and profits either in cash or in partnership assets, whichever may be agreed upon between the parties to this agreement and in the event of the disagreement between the parties hereto, the partnership business shall be sold and liquidated and distribution made in the manner provided above. "11. First Party agrees to indemnify Second Parties against any and all liability to Second Parties and any losses sustained by Second Parties including reasonable attorney fees by reason of violation by the partnership business and/or First Party of any and all City, County, State and Federal laws, statutes, regulations and ordinances. "12. This partnership agreement may be amended at any time by the unanimous agreement of the parties hereto." There were 16 such agreements made, effective between April 9 and June 3, 1943, and terminating between July 30 *43 and October 31. Nate and Ben invested from $250 to over $1,800 in each market based upon a percentage of the inventory and received from 30 per cent to 90 per cent of the profits. One other market was rented from the owner at $250 per month and Nate and Ben took the entire profit of $7,841.97. The purpose of these retail market agreements was to effect further collections of overceiling prices on meat sold by Packing and there was no intention on the part of Nate and Ben Miller to join with the other parties in the conduct of the markets as partners for any other purpose. Adolph Miller authorized the collection of overceiling payments on meat sold by Packing. Nathan and Ben Miller and their wives, filed Federal income tax returns for the years 1943, 1944 and 1945 on a community property basis. They did not include in their original returns the overceiling payments collected and retained by Nate and Ben, except for the amounts received from their retail market contracts. In 1948 Nathan and Ben Miller and their wives filed amended income tax returns for the years 1943, 1944 and 1945, and included amounts aggregating $62,000 for 1943, $19,600 for 1944 and $28,800 for 1945 of additional *44 income. They paid the additional taxes and accrued interest thereon. Subsequent to the filing of their amended returns, Nathan Miller and Ben Miller were indicted in the United States District Court for the Southern District of California for filing fraudulent income tax returns for the years 1944 and 1945. They pleaded nolo contendere and were fined on each of two counts. Neither the corporation nor Adolph Miller was indicted for tax evasion. Amount of Overceiling Collections The overceiling collections amounted to $167,000 in 1943, $65,000 in 1944 and $80,000 in the first three months of 1945. During the period April to October 1945 Nate and Ben received $80,779.68 from their retail market contracts. Union Feed Yards, Inc. Union Feeds Yards, Inc., leased a feeding yard at Bassett, California, from the Los Angeles Livestock Association. The lease was for the term April 1, 1942 to March 31, 1947, called for a rent of $550 per month and prohibited assignment or subletting without consent of the lessor. Packing guaranteed payment of the rent to the lessor. Until November 1, 1943, Feed Yards operated the yard primarily for the feeding of cattle owned by Packing or Nathan Miller, *45 although cattle of other owners were fed on a commercial basis. Feed Yards filed a corporation income and declared value excess profits tax return for the fiscal year ended October 31, 1943, * reporting gross sales of $302,562.38, gross profit of $32,034.03, and net income of $5,561.12. Its return for the fiscal year ended October 31, 1944, reported gross sales of $41,693.44, gross profit from sales $151.31, income from rent $8,372.04, rent paid $6,600, and net income of $924.67. Subsequent returns reported no income from sales and gave rents as the principal source of income. C. P. Richins and his son Norman Richins were experienced in cattle feeding. C. P. Richins worked at the Bassett Yards from about 1935 until 1939 and thereafter at Blythe. During 1943, 1944 and 1945 C. P. Richins devoted most of his time to the feed yard at Blythe but occasionally worked at Bassett when needed there and Norman Richins worked at the Bassett Yards. In 1943 Feed Yards paid C. P. Richins a salary of $914.29. Stock Farms paid C. P. Richins salary *46 for 1942, 1943, 1944 and 1945 in the respective amounts of $3,448.64; $572.05; $5,000 and $3,000. No salary was paid C. P. Richins for 1946 or 1947 by either Stock Farms or Feed Yards. Norman Richins was paid salary of $4,120 for 1942 and $1,157.14 for 1943 by Feed Yards and $750 in 1942 bystock Farms. He received no salaries from these corporations for 1944, 1945, 1946 or 1947. Robert Miller worked at the Bassett Yards after 1941 until he entered the Army in September 1943. Feed Yards sold feeds prior to 1940 and stopped the practice, resuming it about June 1943. Feed Yards purchased machinery and equipment and made repairs to machinery and equipment during the period May to October 1943 in the amount of $4,952.24. On or before September 10, 1943, C. P. Richins, Norman Richins and Robert Miller formed a partnership to do business as Union Feed Company, with a view to taking over operation of the feed yard at Bassett at the expiration of the fiscal year of Feed Yards on October 31, 1943. Under date of September 10, 1943, they entered into a sublease agreement with Feed Yards to be effective November 1, 1943, under which the partners agreed to pay to Feed Yards rent of $550 per month, *47 plus depreciation on the equipment and 25 per cent of the profits. Robert Miller entered the Army prior to November 1, 1943, but the remaining partners took over the operation of the yard as of that date. Each of the three partners was to receive 25 per cent of the profits of the operation. Under date of November 30, 1943, the arrangement was changed by amendment whereby Ben Miller became a partner receiving the 25 per cent of the profits previously allotted to Feed Yards. In addition to feeding cattle, the partnership went into the business of grinding and mixing cattle and poultry feeds on a commercial basis. The partnership mixed an alfalfa meal which was bagged and sold commercially. Ben Miller made sales of feed through his connections in Los Angeles. Feed Yards and Union Feed Company had the following sales: Sales
Feeding
Fertilizer
Meal
Union Feed Yards, Inc.
Year ending 10/31/40
$184,460.96
Year ending 10/31/41
231.570.68
Year ending 10/31/42
261,612.82
Year ending 10/31/43
156,864.73
$ 1,243.69
$144,453.96
Union Feed Company
Year ending 10/31/44
202,774.22
31,585.28
169,550.36
Year ending 10/31/45
359,723.38
26,037.20
142,696.64
11/1/45-4/30/46
261,564.28
5,934.24
120,334.67
Year ending 4/30/47
435,445.34
31,565.40
172,454.08
*48 The first payroll of the Union Feed Company from November 1, 1943, to November 5, 1943 was paid for by Feed Yards. This amounted to $475.06 and was repaid by the Union Feed Company to Feed Yards, at a later date. In October 1943 Feed Yards constructed a hay shed for $3,047.75. On October 31, 1943, Feed Yards had an operating surplus of $16,439.14. Union Feed Company made its first bank deposit on November 12, 1943. This included accounts receivable of $3,696.37 owed Feed Yards prior to November 1, which amount was repaid to Feed Yards later. Union Feed Company charged Packing $33,886.92 for feeding cattle for November 1943. Prior to July 31, 1943, Packing retained fertilizer income from the feed yards at Bassett. "Fertilizer income" refers to income derived from the sale of cattle manure from the yards. The income to Packing from this source was $33,207.13 in the 12 months ending October 31, 1942; and in the nine months ending July 31, 1943, it amounted to $10,844.87. Fertilizer income from Packing cattle at the Bassett Yards for August, September and October 1943 amounted to $1,543.69 and was retained by Feed Yards. Fertilizer on the ground on November 1, 1943 was not *49 paid for by Union Feed Company. Fertilizer income for November 1943 amounting to $4,664.81 was not paid for by Union Feed Company. Fertilizer income from and after November 1, 1943 was retained by Union Feed Company. All cattle fed by Union Feed Company during the year November 1, 1943 to October 31, 1944, were owned by Packing, or Nate Miller, or one of Nate's partnerships. Of the cattle fed by Union Feed Company in the year November 1, 1944 to October 31, 1945, 93 per cent were owned by Packing or Nate or one of his partnerships. The inventory of feed of Feed Yards was $5,526.15 on May 31, 1943, and $41,542.13 on November 1, 1943. The feed inventory of Union Feed Company was $41,768.51 on November 1, 1943, $29,241.71 on November 30, $24,536.73 on December 31, 1943, and $20,543.58 on January 31, 1944. C. P. Richins left the partnership about April 1946. Union Feed Company filed partnership returns of income for fiscal years ended October 31, 1944, 1945, for the six-months period November 1, 1945 to April 30, 1946, and the fiscal year ended April 30, 1947. The business is stated as milling and cattle feeding and the address as Puente, California. The returns show, among other *50 items: Fiscal period ending
10/31/44
10/31/45
4/30/46
4/30/47
Gross Receipts
$497,682.43
$619,215.96
$438,660.10
$740,450.84
Inventory end of period
15,225.00
26,229.41
24,798.17
21,604.80
Gross profit
70,353.82
77,731.72
32,288.68
79,245.67
Net income
42,257.03
59,694.15
22,298.72
56,568.64
C. P. Richins
10,231.57
15,073.53
6,024.68
Norman Richins
13,253.73
17,473.54
5,866.35
21,256.21
Robert Miller
9,385.86
13,573.54
7,116.35
21,556.22
Ben Miller
9,385.87
13,573.54
3,291.34
13,756.21
Canning Operation Prior to May of 1943, George Fickeisen, in partnership with another, operated a meat canning business known as Best-Ever Meat Products Company. This partnership had a contract with the Government to supply canned meat but had difficulty in securing meat. Fickeisen asked Adolph Miller whether Packing would be interested in taking over that contract. Adolph refused to have the corporation assume the contract but authorized formation of a partnership know as Best-Ever Canning Company to do so. The Millers held a 57 per cent interest in the canning company partnership divided among Adolph, Nate and Ben Miller, *51 and an interest of 43 per cent was held by Hazel Shivel. The partners made no capital intvestment. The partners leased the canning facilities from Fickeisen and Anna Colesie, taking a two-year lease with option to buy. Fickeisen worked in the business as an employee. Packing loaned the partners about $55,000 in June 1943 which the partnership repaid within about 60 days. Meat was secured on credit from Packing and other suppliers. On June 22, 1943, the partnership paid Packing $76,071.59 for meat previously bought on credit. Adolph secured a contract for the cannery to make a canned product for the Russian Government. The partnership had some 80 to 100 employees none of whom were employees of Packing. The partnership kept separate books, had its own bank account and telephone number, and filed a certificate of doing business as a partnership. The amount of meat furnished by Packing was counted in fulfilment of Packing's Government quota. Fickeisen was paid a salary of $150 per week and Ben Miller a salary of $100 per week. Hazel Shivel subsequently divided her interest with her daughters. Best-Ever Canning Company paid $75,000 to Packing on August 11, 1943. Packing made advances from *52 this fund to Hazel Shivel and payments on account of the income tax liability of all the partners. On June 28, 1944, the partners changed the name of the partnership to Union Canning Company. Union Canning Company paid to Packing $50,000 on November 11, 1944; $25,000 on December 6, 1944; $20,000 and $25,000 both on March 22, 1945. All these amounts were credited to the account of the partnership on the books of Packing. Some expenditures were made from this fund for benefit of the partners. On September 24, 1945, the balance of $29,282.05 in the account was paid to the partnership. In May of 1945 the lease expired, the partnership was dissolved and each partner received his full distributive share. Hazel Shivel received an additional $5,000 representing her interest in the canning equipment. Ben Miller and George Fickeisen formed a new partnership known as Best-Ever Packing Company to continue the business. Ben divided his interest with his brothers Nathan and Robert, and his sister Rose Marie Goode. The business was continued by this partnership until on or about January 31, 1946, when a corporation known as Best-Ever Packing Company was formed, to take over and continue the business *53 previously operated by the partnerships. The partnerships filed tax information returns reporting their profits from May 1943 until January 31, 1946. The returns of the canning partnerships showed the following: Best-Ever
Union
Best-Ever
Canning Co.
Canning Co.
Packing Co.
6/1/43-5/31/44
6/1/44-5/31/45
6/1/45-3/31/46
Gross receipts
$782,135.92
$1,279,508.67
$1,440,146.14
Gross profit
126,595.15
128,980.86
156,677.06
Partner's shares
99,021.60
81,342.49
118,688.41
Adolph Miller
18,225.11
14,467.07
Ben Miller
21,325.11
19,667.07
28,236.14
Nate Miller
18,225.10
14,467.07
24,736.14
Robert Miller
24,736.14
Hazel Shivel
14,388.24
11,421.38
Lita Dishman
13,429.02
10,659.95
Ann Goodman
13,429.02
10,659.95
Rose Marie Goode
24,736.15
George Fickeisen
16,243.84
Cattle Dealings During 1942, 1943, 1944 and 1945 until September 1, 1945, Nate Miller was employed as a cattle buyer for Packing. He received a salary of $7,700 in 1942, $7,780 for 1943 and for 1944 and $4,760 for 1945 prior to September. Occasionally Packing had a surplus of cattle at the plant and sold them to other processors or to cattle dealers. *54 In December 1942 Nate arranged for the sale of a number of cattle which had cost Packing $13,666.76 (exclusive of feeding and handling costs) for $15,032.60. The purchaser paid $13,192.85 to Packing and $1,839.75 to Nate. Nate remitted $473.91 to Packing covering the balance of its cost and retained the profit of $1,365.84. This amount was reported as income on a partnership return filed by Nate and Ben, doing business as Miller and Miller, as divided equally between them. Nate and Ben filed a partnership return for 1943 reporting sales of $92,575.91, cost of goods sold of $78,722.88, and profits of $13,853.03. These profits were derived from seven sales of cattle held by Packing which were sold by Nate through commission houses at a profit which Nate divided with Ben and other persons. J. W. Espy took part in one transaction and earned a commission of $1,071.31. This was shown on the return as a share of the profits. George Epstein received $500 and Nate and Ben each received $6,140.86. In 1944 Nate established a line of credit of $60,000 with the Bank of America, and handled about 25 transactions involving purchases and sales of cattle. Nate gave his brother Ben a share of the *55 profits. Ray Latimer paid $5,000 to Nate in July 1944 and was repaid the amount in December 1944. He performed no service in these transactions. He made the investment and was shown on the partnership return as receiving a share of the profits in order to be able to show on his income tax return an amount of income equal to the overceiling collections he received. Nate had authority to approve vouchers for payment by Packing and in some transactions he was both seller and agent for the buyer. In a typical transaction Packing purchased 615 steers in June 1944. Of these 465 were used in production and 150 were sold to other packers for $22,243.75. Packing recorded its costs at $71,456.23 which amount it paid Nate in installments, but omitted to show on its books the procees of the sale which Nate collected and retained. Feed costs were paid as incurred and Nate remitted the purchase price to the vendors in installments. He paid out a total of $83,202.63 and retained a profit of $10,497.35. Part of this profit in the amount of $5,089.08 was paid to John Hachten. There were similar transactions in which profits were retained by Nate. A partnership return for 1944 was filed under the *56 name of Nathan Miller, et al., reporting sales of $438,087.15, costs of $388,274.53 and net income for distribution of $48,922.15. Partners' shares were shown as Latimer $19,196.84, Hachten $5,089.07, Ben Miller $7,625.40 and Nate Miller $17,011.26. In 1945 income was reported on the individual returns of Nate and Leona Miller derived from purchases of cattle made in October, November and December 1944. In October and November Nate purchased 1,721 head of cattle for Packing. Of these 1,714 were used in production and seven were sold to other persons. A profit of $29,615.45 was realized in 1945. In December 1944 Nate purchased 1,185 head for Packing. These were used in production and a profit of $8,371.19 was realized in 1945. The total profit of $37,986.64 was retained by Nate and was reported for tax purposes as part of Nate's income for 1945. In the transactions prior to September 1945 sales by Packing were run through Nate's records as a purchase by Nate from Packing and a resale by him. Purchases made for Packing were run through Nate's records as a purchase by him from the vendor and a resale by him to Packing. In sales Nate usually received funds from the buyer before he *57 paid Packing and on purchases he usually received payment from Packing before he paid the vendor. On or about September 1, 1945, Nathan Miller left the employ of Union Packing Company and formed a partnership with Charles Whitlock, who had been a buyer for Cudahy Packing Company, under the name of Alkali Cattle Company, herein sometimes referred to as Alkali, doing business as buyers and sellers of cattle. Whitlock had never been an employee of Packing nor was he in any way related to the Miller family. The Bank of America National Trust & Savings Association approved a joint line of credit to Alkali and Packing on September 26, 1945, in the amount of $1,000,000. The first sale by Alkali was made on September 17, 1945. Eighty-three per cent of the dollar volume of Alkali's sales in September 1945 was made to Packing. In October, November and December 1945 of the total dollar volume of cattle sold by Alkali, 23.6 per cent was sold to Packing, of the total dollar volume of feedlot cattle sold, 31.4 per cent was sold to Packing, and of the total dollar volume of order buying cattle sold, 3.8 per cent was sold to Packing. Packing advanced $51,500 to Alkali on September 19, 1945, and *58 other amounts to a total of $103,740 by June 7, 1946. These advances were deducted from sales by Alkali to Packing at the rate of $20 per head until July 24, 1946. On that date Alkali paid the remaining balance of $26,580. Whitlock at first had a 15 per cent partnership interest which was increased to 25 per cent and later to 50 per cent. In 1948 Nate sold out his interest in Alkali to Whitlock who continued to operate the business. Nate Miller and Whitlock filed partnership returns. Gross profits reported were $155,791.57 for the year ending August 31, 1946; $288,815.17 for the year ending August 31, 1947, and $177,769.97 for the nine months ending May 31, 1948. Partners' distributive shares for the same periods respectively were, Nate, $102,729.86, $196,464.03, and $74,167.80; Whitlock, $26,034.68, $64,739.25, and $74,167.80. Alkali owed the bank $668,082.61 on December 31, 1945; $552,700 on December 31, 1946; and $488,500 on December 31, 1947. Union Stock Farms Prior to 1944 Union Stock Farms acquired approximately two thousand acres of farming land within the Palo Verde Irrigation District near Blythe, Riverside County, California. This company built a feed mill and *59 feed yeard upon the property for the feeding of cattle and used the remaining acreage for raising alfalfa and grain. Most of the farming land had been levelled for irrigation by water furnished by the Palo Verde Irrigation District which obtains its water from the nearby Colorado River. This land with the exception of not more than one hundred acres, had been levelled, irrigated and farmed prior to its purchase by Stock Farms. The fall of the Colorado River along the Palo Verde Valley is approximately one foot to the mile and the fall of the farm land of the valley is approximately the same. It is essential for proper gravity irrigation and proper farming to have the land levelled or graded as to fall and as to side fall. In growing the products raised on this land, proper farming requires the building of dirt borders before the crop is planted so that the irrigation water, when released from the service irrigation ditch upon the land, may be controlled within a certain area. If the fall of the land being irrigated is too steep the water will flow too rapidly and wash and tear the soil. It is necessary to have the fields under irrigation properly graded after each crop so that irrigation *60 water may flow over the entire area and not be permitted to stand in depressions or ponds. All of the crops grown on the company's land were annual crops except alfalfa which usually requires three years to grow. After the removal of each crop good farming practice in this district requires re-levelling and touching up of the fields. During the years 1944, 1945, 1946, and 1947 Stock Farms spent sums for permanent improvements or restoration of flooded lands and other amounts for expenses of a recurring nature in preparing land for growing current crops. The amounts expended for repairs of an annually recurring nature were $30,000 in 1944, $40,000 in 1945, $20,000 in 1946, and $2,785.17 in 1947. In 1947 Stock Farms also expended $1,112.23 for lumber for corral troughs, $999.38 for fence posts, and $3,397.78 for lumber for corrals. These were used in the necessary repair of the feeding corrals. No new corrals were built in that year. The company also purchased a heater for $118.85 and two coolers for $276.75. Union Stock Farms paid $3,525 to Robert Miller, as salary for 1944. Robert was called into the Army in August or September 1943 and released in March 1946. He performed no services *61 for Stock Farms in 1944. Robert had worked for Stock Farms at Blythe for about six months in 1940 or 1941, after which he worked at the Bassett Yards until he was drafted into the Army. He was not an employee of Stock Farms at the time he was drafted. During 1943, 1944 and 1945 Ben Miller was engaged in the wholesale feed business on his own account, having an office, a warehouse and a California feed dealers' license. He handled various livestock feeds including citrus pulp. Stock Farms had a contract with Mission Dry Orange Company whereby it could acquire certain quantities of citrus pulp which it used to make cattle feed. In 1944 Stock Farms had no use for some of the pulp. Ben Miller purchased it through Stock Farms using his own funds and resold it through feed brokers. Ben also acquired meat scrap from various packers and bones from the cannery business which were processed into meat and bone meal, or glue. In 1943, 1944 and 1945 he had profits from these transactions amounting to $889.50, $4,664.09 and $1,069.90, respectively. In 1946 Stock Farms expended the sum of $283.25 for purchase of clothing for Norman Richins who was not an employee of the corporation in that year. *62 In 1945 a quantity of wheat from Australia consigned to the Reconstruction Finance Corporation was unloaded at East Los Angeles and some was found to be damaged. Stock Farms purchased over 100 carloads of this for use as feed or fertilizer. Adolph Miller arranged a sale of five or six carloads of this to California Cotton Oil Mills in 1945 and kept the profit on this sale in the amount of $3,628.80, which amount was included as income in the returns of Adolph and Pauline Miller for 1945. Most of the wheat was used at the feed yard at Blythe..p1199 A quantity was sold to a brokerage firm, and some of this was sold under an arrangement to put a profit in the hands of Adolph Miller's nephew, Meyer Schorr, in 1946. Schorr did not have the capital to buy the wheat and after an offer to buy was received by Stock Farms from brokers the wheat was transferred to Schorr for resale to the brokerage firm. Schorr gave Stock Farms his check dated March 5, 1946, for $58,170.97 and retained the realized profit of $12,094.26. Union Packing Company Adjustments In each of the years 1942 to 1946 Packing paid amounts to Hazel Shivel shown on the books as salaries. These payments were made in fulfillment *63 of an agreement made between Adolph and Glen Shivel to the effect that upon the death of either, the survivor would cause the corporation to pay the widow of the other an amount equal to one-half the salary of the survivor. The amounts paid her were $8,185 in 1942 and $8,320 in each of the years 1943, 1944, 1945 and 1946. Hazel Shivel performed no services for Packing. After the sale of her stock in September 1947 these payments terminated. In 1943 Packing made certain major alterations or changes in its packing house equipment and facilities. Some of these had to do with the refrigerating equipment. The ice machines were overhauled. The entire wiring system was obsolete and had to be replaced and new switch panels installed. Two boilers were overhauled and reset. Operating units in the rendering department were rusted and had to be replaced. A new roof was built for this department. The hasher was overhauled. The hog slaughtering equipment was rearranged to meet Federal regulations. The refrigerating equipment in the sausage chill room had to be replaced and overhauled. The smoking facilities were broken down and required major overhauling and new parts had to be procured. The sewer *64 lines were in bad condition and required reopening. Expenditures were made to put the plant in normal running condition. Part of the expenditures were required to have facilities comply with Government regulations. On its returns for 1942 and 1943 Packing claimed amounts as deductions for expenses of repairs of equipment and repairs to buildings. The respondent disallowed $3,852.92 and $23,246.51 claimed for repairs to equipment and buildings, respectively, in 1942 and $15,815.91 and $9,947.19 claimed for repairs to equipment and buildings, respectively, in 1943. These amounts were paid for additions, replacements and improvements of a kind that would last for some years. In computing taxable income for 1942, Packing deducted $14,836.25 as an addition to its reserve for bad debts, and for 1943 a deduction of $3,085.61. The company's reserve for bad debts for these years was computed as follows: Accounts
% of
Reserve
Receivable
Reserve to
Balance
Balance
Acct. Rec.
Balance in Reserve as adjusted for 1941
$16,542.77
$140,040.55
11.78
Added to Reserve for 1942
14,836.25
Total
31,379.02
Charged against Reserve
1,711.08
Balance 12/31/42
29,667.94
194,209.70
15.37
Added to Reserve for 1943
3,085.61
Total
32,753.55
Charged against Reserve
5,753.61
Balance 12/31/43
26,999.94
203,657.72
13.25
*65 In its return for 1944 Packing claimed a net loss upon the sale of property other than capital assets in the amount of $3,704.25. A claimed net loss on the sale of land in the amount of $9,205.92 was disallowed by the respondent. The company's books showed cost of the land acquired in 1931 was $18,151.02 and selling price as $9,013.50 with cost of sale as $68.40. Best-Ever Packing Company (corporation) Best-Ever Packing Company filed a corporation income tax return on the accrual basis for the fiscal year ended January 31, 1947. Gross sales of $1,720,055.63 and gross profit of $375,324.97 were reported. Deductions were claimed for $7,339.37 for certain expenses and $1,661.02 for repairs to a power installation. The corporation subsequently claimed a net operating loss carryback from the year ending January 31, 1948, of $168,713.62. Included in this amount was an item of $48,100 for a claim presented by the Army on account of an alleged default in performance of a vegetable and hash contract, which amount the corporation accrued upon its books as a liability. The claim was presented in a letter dated 18 November 1947 from Headquarters, Chicago Quartermaster Purchasing Office. *66 Attorneys' Fees In 1946 Union Packing Company, Adolph Miller, Nathan Miller, Ben Miller, George Epstein, Ray Latimer and Neil Leising were indicted in the United States District Court for the Southern District of California for violations of price ceilings. The indictments were dismissed as to Union Packing Company and Adolph Miller. The other defendants pleaded nolo contendere, and were each fined $10,000. In 1946 Nate and Ben paid attorneys' fees in the amount of $10,000 in connection with these indictments, and other attorneys' fees in the amount of $250 in connection with another price ceiling violation not of a criminal character. Opinion TIETJENS, Judge: The respondent's determinations of deficiencies and additions to tax for fraud are based in large part upon the conclusion that the petitioners Adolph Miller and his sons, Nate and Ben, were contriving to evade taxes due from the corporation's Packing, Stock Farms and Feed Yards which Adolph controlled through his majority stock ownership of Packing. The respondent's theory may be outlined thus: Adolph ran the business of the three corporations, and his sons, although not officers, exercised the authority of officers *67 with Adolph's approval and ran the business in his absences. No dividends were declared. The minority stockholder Hazel Shivel, although paid a purported salary, was not permitted to interfere in the management. When she asked for money to pay inheritance taxes she was told that Packing was not making enough profits to pay dividends but she would be given a share in the canning business. She was made a nominal partner in that operation at the same percentage as her stock holdings in Packing, 43 per cent. By this means and by receipt of the salary paid by Packing she derived about $100,000 in the period from December 1940 to September 1947, while Adolph, by his 57 per cent ownership and 100 per cent control of Packing, channeled to himself and his sons from corporate functions about one and one-half million dollars. This was accomplished by several methods. The principal devices involved the collection of overceiling prices on meat produced by Packing, transferring corporation earnings to fictitious partnerships operating a cattle feeding yard and a meat canning business, and diverting profits from purchases and sales of cattle owned by Packing. Through these and other practices the *68 Millers evaded corporation taxes and siphoned to themselves individually earnings from the corporations' businesses. On the other hand the petitioners refer to cases in which we have stated that the tax laws do not undertake to deny taxpayers the right of free choice in the selection of the form in which they carry on business, Buffalo Meter Co. (1948) 10 T.C. 83, p. 89, and that there is no obligation on stockholders to arrange their own and their corporation's affairs so as to result in a maximum tax burden. Seminole Flavor Co., 4 T.C. 1215, p. 1235. It has long been recognized that taxpayers may decrease the amount of what would otherwise be their taxes by any means which the law permits. In some of the situations here presented these principles are applicable and controlling. In view of the number of issues contested and for convenience in referring to the pertinent facts, the issues or groups of issues are discussed under separate headings corresponding to the headings under findings of fact. Overceiling Collections The respondent determined that *69 the overceiling collections on meat were income to Packing for the reasons that Adolph Miller originated the practice of collecting amounts in excess of the ceiling prices and authorized and directed the continuation of the practice, that he did this as managing officer and majority stockholder of the corporation, that the collections were based upon sales of the corporation's merchandise and could not be considered as payments for additional services since none were rendered, and that since collections were made from about 90 per cent of the corporation's customers and continued over a period of some two years or more, the collections could not be regarded as isolated transactions by employees aside from the corporation's business but were made by or on behalf of the corporation at the direction of its responsible officer. The petitioners contend that Adolph had no part in the collections and was unaware of the practice, that the collections arose from a scheme devised by Nate Miller and Latimer to make money for themselves and others on the side and that the amounts collected were not income to Packing because the corporation received the full ceiling price on its products and could *70 not lawfully receive more. There is differing testimony as to Adolph's knowledge of or participation in the collection of overceiling amounts. August Vogel, who had been one of Adolph's associates in forming Packing and who was president of Golden State Meat Company, a wholesale meat jobber and a customer of Packing prior to 1943, testified that in a discussion in early 1943 in Adolph's office, Adolph said he was losing money at the O.P.A. ceiling prices and if he couldn't get more he would quit and sell his cattle, and that he would need to collect 10 per cent additional in order to stay in business. Vogel replied that he couldn't pay additional amounts unless he passed it on to his own customers which he refused to do. Vogel found his meat supply from Packing was cut off. Joe Goldstein, who was president of Boys Market, Inc., which bought all its meat from Packing, testified that he had a conversation with Adolph and Epstein at Packing's plant, in which Adolph said he would have to ask for a cash payment of 10 per cent over the invoice prices on meat in order to stay in business. Goldstein paid the additional amount which later was increased to 20 per cent. Goldstein said he paid *71 a total of $10,000 in overceiling amounts and on instructions from Adolph usually handed the money to Latimer, but made at least one payment to Adolph. He paid during 1943 and 1944. In 1945 Nate and Ben Miller proposed that Goldstein give them a 50 per cent interest in his company's markets and they would let him have all the meat he could sell. Goldstein refused and Packing stopped supplying him. Ray Gottbehuet, manager of the meat department in his company's markets and they would let him have all of Mayfair Stores which bought a substantial amount of meat from Packing, testified that he had a conversation with Adolph early in 1943 at which Adolph proposed that Mayfair pay in cash the difference between what the cattle cost and what Packing could lawfully receive for the meat and that he refused to pay more, with the result that Mayfair's supply of meat from Packing was greatly reduced and later was stopped. Ray Latimer, former sales manager for Packing, testified that in April 1943 Adolph told him that certain customers were paying extra money on the side and instructed Latimer to see that those customers received meat, that Adolph later instructed him to tell all the customers *72 to pay 10 per cent additional in cash, that 90 per cent of the meat went thereafter to the customers who paid and that most of the money was handed to Latimer and by him turned over to Nate or Ben. The money was counted by Nate and Epstein in Packing's office with Latimer present. On the other hand Adolph denies any knowledge of or participation in the collection of overceilings and testifies that a back injury in 1942, sciatica in 1943, and an operation in 1944 at Rochester caused him to be absent from the plant at various times. He said that Vogel must have misunderstood him and that he had no such dealing with Goldstein as the latter described. Nate testified that the scheme was originated by Latimer with Nate's approval but without his father's knowledge. Petitioners point out that the indictments for violation of O.P.A. regulations were dismissed as to Adolph and Packing, while the other participants were fined. Adolph was in general supervision of all the business of Packing and its subsidiaries. He participated in every activity, procured an order for the canning partnership, bought 100 carloads of wheat and made some sales for Stock Farms, and spent some of his time at *73 Blythe and some at Packing's plant. The overceiling collections were made weekly during a period of about two years and the money collected was counted in the offices of the packing plant. A number of the customers protested to Adolph. We do not believe that Adolph did not know what was going on in the business under his immediate supervision. We think the evidence sufficiently shows that Adolph sanctioned, if he did not originate and direct, the overceiling collections, and we have found as a fact that he authorized them. In United Dressed Beef Co., 23 T.C. 879 (1955) we held that overceiling collections made by and under the orders of the two stockholders of a corporation were taxable as income to the corporation. In that case, as here, the collections were based upon sales of meat owned by the corporation, the corporation's books showed only the ceiling prices which were generally paid by check and the overceiling amounts were handed over weekly in currency in envelopes. In that case the two equal stockholders shared equally in the collections. In the present case two sons of the controlling stockholder took the collections with his approval and retained most of *74 them. The petitioners cite Harry Sherin, 13 T.C. 221 (1949), in which we held that certain overceiling collections were not taxable as income to the corporation there involved. In that case Berger, who was president and holder of 50 per cent of the stock and in charge of sales, accepted cash overceiling payments in return for preferential services and deliveries to certain new customers. Sherin, who owned the remaining 50 per cent of the stock and was actively in charge of the producing plant, was not aware of these collections, did not share in them and disavowed any connection with or responsibility for the practice. In that case collections were made from only seven out of over 100 customers of the firm and some special services were rendered the customers who paid. Although Hazel Shivel, owner of 43 per cent of stock, had no part in this transaction and received no part of the proceeds of the overceiling collections, she had only a minority interest and in actual practice she was not consulted as to business operations and was not permitted to have any part in the management, while Adolph, as president, majority stockholder, and the officer actively in charge, exercised *75 authority to act alone on behalf of the corporation. The Sherin case is not applicable here. We conclude that the overceiling collections were income to Packing. United Dressed Beef Co., supra. The respondent's position is that the overceiling collections were income to Union Packing Company and dividend income to Adolph and Pauline Miller, and should be treated as gifts from Adolph to his sons and their wives and not as income to them. In the event these collections are not held to be income of the corporation, the respondent asks in the alternative that they be treated as income to Nate and Ben Miller and their wives, to the extent they received these amounts. Since we agree with the respondent that these collections were income of the corporation, it is not necessary to discuss the alternative position. Amount of Overceiling Collections The respondent determined that cash overceiling collections on sales of meat owned by Packing aggregated $250,000 in 1943, $100,000 in 1944 and $160,779.68 in 1945. The petitioners contend that these amounts are arbitrary and unreasonable. No part of these collections was reported on the returns of Packing or Adolph or Pauline. *76 Nate and Ben and their wives reported no part of these collections on their original returns, but on amended returns for 1943, 1944 and 1945 which were filed in December 1948 they reported an aggregate of $62,000 for 1943, $19,600 for 1944 and $28,800 for 1945. Nate testified to total overceiling collections of $78,000, $30,000 and $30,000 for these years respectively. He said that he took out some money for incidental expenses, paid $100 per week to Epstein, Latimer, Ben and himself and kept the rest in an envelope for a time and later divided it between himself and Ben. Nate said that his record of the collections was destroyed by the end of 1947 and Ben said any record he had was destroyed by the end of 1946. Thus there was no record available at the time the amended returns were made and the amounts reported thereon were obviously estimates. According to the testimony of Latimer, overceiling was paid on at least 90 per cent of the meat sold to civilian customers, an average of 375 beeves at 500 pounds each were sold each week to civilian customers, the overcharge was originally 10 per cent and later was based upon weight amounting to from two cents a pound to four cents a pound *77 and in some cases six or eight cents a pound. Latimer who received most of the envelopes and was present when the money was counted, estimated the amounts collected at $250,000 in 1943 and $100,000 in 1944. The reduced amount in the later year was explained as resulting from the facts that some customers had found other sources of supply and sometimes more cattle were available in which case no overceiling amounts could be collected. There were some overceiling collections on pork and veal. Latimer estimated the total collections for 1943 as amounting to $10,000 a week for April, May and June, and $5,000 a week for the remainder of the year. Leising, a salesman, estimated that beef from 100 head of cattle were sold to civilian customers every day during January, February and March 1945 and that overceiling was paid on at least 90 per cent of this at the rate of five cents a pound. The respondent computes the amount of $135,000, based upon 500 pounds per beef, five days per week for 12 weeks. Nate and Ben received $80,779.68 from certain so-called retail partnerships operated from April to October 1945. The respondent treated the proceeds received by Nate and Ben from these partnerships *78 as continuing the overceiling collections under another guise. Thus, according to the respondent, the collections for 1945 might be regarded as amounting to $215,779.68 and the determination that they amounted to $160,779.68 was conservative. The burden is upon the petitioners to prove that the amounts so determined by the respondent are incorrect. The petitioners argue that the determination is arbitrary and excessive, and urge that upon a showing to that effect the presumption of correctness attaching to the respondent's determination must fall, citing Helvering v. Taylor (1935) 293 U.S. 507. This case is not applicable for the petitioners have not shown that the amounts so determined are arbitrary and excessive. They have produced no evidence to show that the quantity of meat sold to civilian customers or the rates of overceiling collections were different from those forming the basis of the respondent's calculation. The amounts determined for 1943 and 1944 were based upon Latimer's estimates alone. Except for the testimony of Nate and Ben there is no evidence to contradict *79 these estimates. Latimer had no record of the full amount collected and we do not consider his recollection and estimates entirely reliable. We have found in our best judgment on the conflicting testimony and in the absence of records that the amounts of overceiling collections were $167,000 in 1943 and $65,000 in 1944. We think the respondent's determination of the amount collected in 1945 was conservative and reasonable. No error has been shown in the conclusion that $80,000 was collected in the months of January, February and March 1945. Nor has error been shown in the inclusion of the income derived from the retail sales contracts. Nathan Schalman who operated a retail meat market and entered into one of the agreements with Nate and Ben Miller, testified that the agreement was proposed as a means of eliminating the overceiling payments he had been making. He was told that if the 50 per cent share to be paid the Millers should exceed the overceiling amounts he had been paying for the same quantities he could get a refund of the excess. In one month the 50 per cent payment did exceed the overceiling amount computed on the same volume and he requested and received such a refund. Ben *80 testified that he wanted to cease collecting overceiling prices and thought the retail meat ceiling prices afforded a good margin for operations. From the testimony and other evidence of the circumstances under which these agreements were made we have found as facts that these arrangements were intended as a means of collecting overceiling prices on meat sold by Packing and the so-called partnerships were without a valid business purpose and were not bona fide. The respondent correctly determined that the proceeds of these retail agreements were income to Packing. Union Feed Yards, Inc. The respondent determined that the profits derived from operation of the feed yard at Bassett which were reported as earnings of the partnership of Union Feed Company were income of Union Feed Yards, Inc., and that to the extent these profits were distributed to members of the Miller family they constituted dividend income to Union Packing Company and dividend income to Adolph and Pauline Miller. The basis of this determination is the assumption that the partnership of Union Feed Company was not bona fide. The respondent argues that no individual capital was furnished by the partners; there was *81 no change of personnel, since Norman Richins continued to manage the yard as before; there was no new activity undertaken by the partnership, for the corporation had previously operated a feed mill and sold mixed feeds and in the fiscal year ended in 1943 sold an amount of mixed feed comparable with the partners' sales for the fiscal years ending in 1944 and 1945; there was no business reason for the partnership; the sublease to the partnership was void as the lease covering the premises prohibited subleasing and permission to sublease was never obtained; one partner, C. P. Richins, did not receive his true share of the profits; and the principal purpose of the arrangement was to transfer earnings to members of the Miller family and to pay C. P. Richins and Norman Richins salaries not permitted by stabilization restrictions. The evidence does show a business purpose in the operation of the feed yard by a partnership. It appears from the testimony that Adolph Miller through his membership on the beef advisory committee of the O.P.A. learned that the Government viewpoint was unfavorable to the fattening of cattle in wartime and therefore he desired to abandon or limit the use of the *82 Bassett Yard. This was difficult because Feed Yards had leased the yard for a long term and payment of the rent was guaranteed by Packing. On the other hand Norman Richins, manager of the yard, and Robert Miller, who had been employed there, thought the continuance of the yard desirable and believed that a venture in mixing feeds for livestock and poultry with the facilities available at Bassett could be undertaken and would yield a sufficient profit to warrant continuing operation of the yard. Norman Richins and his father C. P. Richins were experienced in cattle feeding and had been in charge in the yards for several years. They, with Robert Miller, formed a partnership to do this, each of the three to receive 25 per cent of any profits, with 25 per cent to be paid Feed Yards in addition to the rent payable to the lessor. On September 10, 1943, the partners entered into an agreement with Feed Yards to sublease the yard from November 1, 1943, at the end of the corporation's fiscal year. Robert was drafted and was unable to perform services in the venture. In November 1943 by a new agreement Ben Miller became a member of the partnership and received the 25 per cent share of profits *83 previously allotted to Feed Yards. Ben performed some services on a part time basis and made sales of feed through his connections in Los Angeles. Norman Richins managed the yard. C. P. Richins was at Blythe, but helped at Bassett when needed. The partners prepared an alfalfa meal which was bagged and sold commercially and the venture proved to be profitable. Adolph was willing that Feed Yards forego profits so long as the rent was paid and loss was avoided. It is not fatal here that the lease prohibited subletting without consent of the lessor. It does not appear that the lessor objected or that consent could not have been secured. Investment of funds was not necessary. The motive of avoidance of taxes, even if present, does not disqualify the partnership. Norman Richins testified that his father did receive his full share of the profits. It appears that the plan of Robert Miller and Norman Richins to carry on the commercial feed business was put into effect in about June 1943, as part of Feed Yards' business prior to the organizing of the partnership and prior to the time Robert was drafted for military service and that the plan contemplated taking over the plant by the partnership *84 only at the end of the corporation's fiscal year on October 31, 1943. This accounts for the profit on feeds attributed to the corporation for the fiscal year ended October 31, 1943. The partners assumed the risk of the operation which Adolph desired to discontinue as probably leading to losses. This is sufficient. See Seminole Flavor Co., supra.The respondent erred in taxing the profits of this operation to Union Feed Yards, Inc. Canning Operation The respondent determined that the profits of the meat canning operation conducted under the names of Best-Ever Canning Company, Union Canning Company and Best-Ever Packing Company (partnership) in 1943, 1944, 1945 and until January 31 in 1946 were income of Packing and dividend income to Adolph Miller. The petitioners contend that the canning operation was carried on by valid partnerships and that respondent erred in this determination. The respondent's argument is that this operation was carried on as a side function of Packing which had previously operated a canning department several years earlier. Fickeisen approached Adolph because he needed meat to fulfil his contract and Packing had the meat. The corporation *85 furnished capital with a loan of $55,000 and loaned its employee Ben Miller, who became manager of the cannery. Hazel Shivel performed no service and contributed no capital and was never in fact a partner. She had asked Adolph for a dividend from Packing to use in paying inheritance taxes and Adolph told her the corporation was not making enough profits. Her sharing in the cannery was a device by Adolph to enable her to realize income in lieu of a dividend from Packing for a while, after which she was eliminated by ending the first partnership and creating a new one without her. The evidence, however, supports the petitioners' contentions that the canning operations were separate from the business of Packing. The cannery had a separate plant and over 80 employees, made separate contracts and bought from several packing concerns. Capital was loaned and credit for meat was furnished to the extent necessary, but Packing was only a creditor and did not acquire ownership of the profits. The returns attest to the fact that this was a considerable operation with gross receipts of nearly $800,000 in its first year and over $1,000,000 in its second. We conclude that the partnerships were *86 valid and that the respondent erred in allocating this income to Packing and to Adolph. Seminole Flavor Co., supra; Buffalo Meter Co., supra. Cattle Dealings The respondent determined that income from transactions in cattle which was reported as income of Nathan Miller, Ben Miller, and others in the years 1942 to 1947 was corporation income of Packing. In the six years this income amounted to over $600,000, after allowance of expenses incurred in its derivation. Prior to September 1, 1945, * Nate was a salaried employee of Packing, primarily engaged in buying cattle but also attending to occasional sales of surplus cattle which occurred when the buyers had contracted for more than the company could readily use. He testified that it was a common practice among buyers for packers to make deals of their own. Nate had authority to approve company vouchers for payment and was thus in a position to pay himself or to pay others from corporate funds. He could act as buyer and as agent for the seller at the same time. In 1942 and 1943 he arranged to take profits for himself on several sales of cattle which he made for the corporation. He paid a commission to J. W. Espy on one sale, gave *87 George Epstein $500 out of the profits and shared the rest with his brother Ben. In 1944 he took profits on both purchases and sales made for Packing. Hachten testified that he was given a share of profits on one transaction as a means of receiving additional salary, payment of which was barred by wage stabilization restrictions. Latimer was shown as a partner to enable him to report as income an amount equal to the share of overceiling collections which had been paid to him, but he performed no service and his investment of $5,000 was a blind. Nate shared the remaining profits with Ben on a basis to equalize their earnings from the cattle transactions and Ben's income from Union Feed Company. Profits realized in 1945 were derived from purchases of cattle made by Nate for Packing in late 1944 while he was still employed as a buyer. Nate reported these as profits of his individual business. We agree with the respondent that prior to September 1945 Nate's purported partnerships and individual business were without business purpose, and were devised as a means *88 of diverting corporation profits to Nate and Ben. Where cattle were sold the transaction was run through Nate's records as a purchase from Packing and a resale by him. Where cattle were bought the transaction was recorded as a purchase by Nate from a third party and a resale at a profit to the corporation. In the sales Nate usually received funds from the buyer before he paid the corporation and in purchases he usually was paid by the corporation before remitting to the seller, thus having no investment and no substantial risk of loss. During this period Nate, as a salaried employee, owed Packing the duty of buying and selling to the best advantage of the corporation. The respondent did not err in determining that these profits were income to Packing. On September 1, 1945, Nate left the employ of Packing and went into business as a cattle buyer in partnership with Charles Whitlock, who had been a buyer for Cudahy Packing Company. Respondent contends that this partnership was fictitious, that Whitlock was Nate's employee and that the profits of this business should be treated as income to Packing. We do not agree as to this. Nate was no longer a salaried employee under a duty to buy *89 for the benefit of Packing. We think the evidence shows that he was in business for himself and that the partnership formed with Whitlock was real. Although the corporation loaned funds to Alkali, the partners had a substantial line of credit and their borrowings from the bank at times exceeded half a million dollars. In the last three months of 1945 the major part of their sales was to concerns other than Packing. The respondent erred in treating the income of Alkali as income of Packing. Union Stock Farms The respondent made a number of adjustments in determining deficiencies in the case of Union Stock Farms for the calendar years 1944, 1945, 1946 and 1947. Respondent on brief concedes error in the disallowance of salary paid Adolph Miller for each year as president. The principal controversy arises out of the disallowance of amounts claimed as expenses of levelling and re-levelling land to maintain irrigation. Respondent determined that the amounts paid for this work were capital items and not deductible as expenses attributable to the current year. Most of the work was done under contract by Harry E. Hansard, who was in the business of land levelling and farm contracting, *90 had heavy earth moving equipment and was experienced in preparing land in the locality for irrigation. It appears from his testimony and other evidence that a substantial part of the work done was of the type required to be done annually or between crops in order to maintain the land levels and the irrigation ditches bringing water to the crops. The amounts paid for this were deductible as expenses. See J. H. Collingwood, 20 T.C. 937 (1953). On the other hand, the testimony shows that a substantial part of the work was upon more or less permanent improvements to the farm. Practically all the land had been previously levelled and farmed but there were several small plots on which work was required to restore damage done by a flood before they could be used again for crops. The work done included construction of new ditches on nearly all the land, changing the course of some ditches, and making borders on several fields. A witness who did the surveying and planning of some of the work indicated that work on only a small part of the land was of a permanent nature. However, there was no allocation made of the costs of this work as between permanent improvements and recurring *91 expenses of an annual nature. Stock Farms claimed in its returns for 1944, 1945, 1946 and 1947 the respective amounts of $62,922.94; $82,793.75; $37,830.38; and $2,785.17 as deductible expenses of land levelling. The respondent disallowed $62,812.94 of the amount claimed for 1944; $82,596.50 of the amount claimed for 1945; and all the amounts claimed for 1946 and 1947. While a substantial part of these amounts should be treated as capital items, we think, on the basis of the evidence of record, a larger allowance should be made for expenses of a recurring nature. Accordingly, we have concluded that $30,000 should be allowed for 1944, $40,000 for 1945, $20,000 for 1946, and $2,785.17, the full amount claimed, for 1947 as deductible expenses; the remaining amounts are regarded as paid for permanent improvements. The respondent disallowed deductions claimed for lumber and fence posts, determining that these were used in the construction of new corrals. The testimony does not bear this out. The cattle were kept in fenced corrals having feeding troughs to supply water. The fences, posts and troughs were frequently damaged by the cattle or by trucks supplying feed or water and required *92 repairing. No new corrals were built at this time. These items were deductible expenses. The respondent disallowed claimed deductions for a heater and two coolers. As no evidence was presented concerning these items we sustain the respondent. The respondent disallowed a deduction claimed in 1944 for salary paid to Robert Miller, who was not an employee of Stock Farms after 1941, entered the Army in September 1943 and performed no services for the corporation in 1944. Petitioners cite Berkshire Oil Co., 9 T.C. 903 (1947). In that case we held deductible a salary paid to an employee who was inducted and who returned to the company upon release from the Army. The cited case is not in point as Robert Miller was not employed by Stock Farms immediately prior to his induction. The respondent's determination was correct. Stock Farms purchased certain damaged Australian wheat for use as feed or fertilizer at Blythe. Adolph Miller sold several carloads at a profit of $3,628.80 in 1945 and kept the profit himself. He also arranged in 1946 to have his nephew, Meyer Schorr, purchase a quantity for resale after the sale to a brokerage firm had been arranged and a profit of $12,094.26 *93 was realized which Schorr retained. The respondent included these amounts in the income of Stock Farms. The petitioners on brief do not argue that this was erroneous, and we sustain the respondent. Norman Richins was not an employee of Stock Farms in 1946. Clothing for work purposes purchased for him was paid for by the company. The respondent correctly disallowed the deduction claimed for this item in 1946. Ben Miller realized certain profits in 1943, 1944 and 1945 from transactions in citrus pulp and other commodities. Ben had an office and warehouse and was licensed to operate in the wholesale feed business. He availed himself of citrus pulp which Stock Farms had agreed to buy but was unable to use. Stock Farms was not in the business of trading in pulp. A part of the profit of Ben's operations was derived from sources unconnected with Stock Farms, such as meat scrap and bone meal, some of which came from the canning operation. The respondent included these profits for 1944 and 1945 in the income of Stock Farms, and decreased a net operating loss carryover from 1943 to 1944 by the amount of Ben's profit for 1943 from these transactions. The respondent erred in treating these *94 profits which we hold were profits from Ben's own business, as income to Stock Farms. Constructive Distributions to Packing The facts relating to these distributions are found under the headings of Union Stock Farms and Union Feed Yards, Inc. The respondent determined that Packing received dividends from its wholly owned subsidiary Stock Farms by reason of the profits realized by Ben Miller from citrus pulp sales, salaries paid to Robert Miller in 1944, and to Adolph Miller in 1945, 1946 and 1947, wheat profits retained by Adolph in 1945 and by Meyer Schorr in 1946, and clothing purchased for Norman Richins in 1946. The petitioners argue that Stock Farms declared no dividends in the taxable years. It is immaterial that no formal dividends were declared for a corporation may be charged with constructive receipt of taxable income paid directly to its stockholder by prior arrangement. Brooklyn & Richmond Ferry Co., 9 T.C. 865 (1947), affd. 171 Fed. (2d) 616 (C.A. 2, 1948); Jack M. Chesbro, 21 T.C. 123, affd. (August 9, 1955 (C.A. 2)), 225 Fed. (2d) 674. *95 The amounts involved in the adjustments we have sustained as to Stock Farms involving salary paid Robert Miller and profits on wheat sales came to the recipients through Adolph's control of Packing and the respondent was correct in treating them as dividends from Stock Farms to Packing. Since the respondent has conceded the issue as to Adolph's salary and we have held inclusion of Ben Miller's profits on pulp sales to be erroneous, a recomputation pursuant to Rule 50 will be necessary. The payment for clothing furnished Norman Richins, although not a deductible expense to Stock Farms, was not received by any of the Millers and is not a part of the constructive distribution to Packing. The respondent also determined that income reported by Union Feed Company was income of Union Feed Yards, Inc., after due allowance for wages, rentals and other expenses of the operation, and that constructive dividends were received by Packing from Feed Yards in the amounts of $26,092.97 in 1944; $14,104.78 in 1945; $7,358.36 in 1946; and $88,641.55 in 1947. Since we have held that Union Feed Company was a valid partnership, its income was not income of Feed Yards and the determination that the above *96 amounts constituted income to Packing is erroneous. Constructive Distributions to Adolph Miller It is the respondent's position that the amounts which were received by Adolph or members of his family from Packing or its subsidiaries constitute constructive distributions from Packing to Adolph Miller, its controlling stockholder and dominant in its management, taxable to him as dividends to the extent there were earnings or profits, including these amounts, available for distribution. We have held that the overceiling collections and proceeds of retail partnership agreements and certain profits on cattle transactions were income to Packing in 1943, 1944 and 1945 and that certain amounts received from Stock Farms by Robert Miller, Adolph Miller and Meyer Schorr in 1944, 1945 and 1946 were distributions constructively received by Packing from its wholly owned subsidiary. It is clear that if these amounts had been received by Adolph they would represent distributions of corporate funds to him. Currier v. United States, (C.A. 1, 1948), 166 Fed. (2d) 346. Since he was the controlling stockholder we must regard the amounts as constructive distributions to him when they *97 were received by his sons or relatives with his approval and consent. Corliss v. Bowers, 281 U.S. 376 (1930). It is as though without the formality of declaring dividends, he nevertheless received corporate funds and gave them to his relatives. See Clark v. Commissioner, (C.A. 3, 1936), 84 Fed. (2d) 725, Paramount-Richards v. Commissioner, (C.A. 5, 1946), 153 Fed. (2d) 602. We agree with the respondent that these items were constructive distributions to Adolph Miller. Union Packing Company Adjustments The respondent disallowed deductions claimed by Packing for amounts paid Hazel Shivel as salary. These amounts were paid pursuant to an arrangement between Adolph Miller and Glen Shivel for payment of such amounts to the widow of the one first to die. The corporation, as such, was not a party to the agreement. Hazel Shivel performed no services for the corporation. The payments terminated upon the sale of her stock. Petitioners cite Seavey & Flarsheim Brokerage Co., 41 B.T.A. 198 (1940) in which deduction as an ordinary and necessary business expense was allowed of payments made by a corporation to the widow of a valuable employee *98 made pursuant to a written contract between the corporation and the employee. The payment was construed as further compensation for the services of the employee. Respondent cites Astorian-Budget Publishing Co., 44 B.T.A. 969 (1941). In that case deduction was not allowed of payments made to the heir of one of the stockholders pursuant to an agreement among the stockholders to continue payments of salary to the heir in case of the death of one of them. The heir inherited the deceased stockholder's stock but performed no services in return for these payments. It was there pointed out that the agreement was among the stockholders as individuals and not between the deceased stockholder and the corporation and that payments were to continue only so long as the heir held the stock and hence were more in the nature of a distribution of profits than of a pension payment. The present case is not distinguishable from the Astorian-Budget Publishing Co. case and is controlled thereby. The agreement was between Shivel and Adolph Miller, not between Shivel and the corporation. Payments were made only so long as the widow held the stock. Hazel Shivel performed no services and was *99 not entitled to a salary. She received no distribution from the corporation except in this form and received this money by virtue of her stockholdings and as a dividend. We conclude that deduction of this item was properly disallowed. The respondent disallowed deductions claimed on Packing's returns for 1942 and 1943 as repairs to equipment and buildings, having determined that the amounts represented capital expenditures. The testimony concerning these payments shows that they covered major replacements or additions, or were improvements that would last for some years and that some were required in order that the facilities might comply with Government regulations. These would appear to be investments of a capital nature. The evidence does not show that the respondent erred. Packing claimed deductions for additions to a reserve for bad debts in the amounts of $14,836.25 for 1942 and $3,085.61 for 1943. The respondent disallowed $10,160.34 of the amount claimed for 1942 and all the amount claimed for 1943. The petitioner showed that the reserve was 11.78 per cent of the accounts receivable at the end of 1941, 15.37 per cent at the end of 1942, and 13.25 per cent at the end of 1943, *100 that the balance on the basis of the respondent's adjustments would be only 6.75 per cent at the end of 1943, and that the actual amount charged off for 1943 was $5,733.61, which is more than the deduction then claimed. The accountant who prepared the returns testified that in his opinion the amounts claimed were reasonable. There is nothing in the evidence to show what the taxpayer's bad debt experience had been prior to 1942. See Black Motor Co., 41 B.T.A. 300 (1940). There is no sufficient showing that the deductions contended for are more reasonable than the amounts allowed by the respondent. The opinion of the accountant is not convincing in the absence of a showing of the facts upon which it was based. Accordingly, the respondent's determination is sustained. Petitioner contests the disallowance of a claimed loss upon the sale in 1944 of a piece of land acquired by Packing in 1931. The respondent determined that no gain or loss resulted from the sale of the land. The only testimony offered to show that a loss resulted was that the books showed a cost of $18,151.02 and selling price of $9,013.50 with cost of sale amounting to $68.40. There was no evidence identifying *101 the land or the circumstances of its purchase or sale. The evidence is not sufficient to prove that the respondent erred. Best-Ever Packing Co. (corporation) Docket No. 32714 The respondent disallowed as items which should have been capitalized amounts of $7,339.37 claimed as expenses and $1,661.02 claimed as repairs to a power installation by Best-Ever Packing Company in its corporation income tax return for the fiscal year ending in 1947, and recomputed the claimed net operating loss carryback from 1948 by disallowing as an improper deduction an item of $48,100 claimed for an accrued liability set up to cover a possible claim by the Army. As a result of these and other adjustments a deficiency of $22,434.36 was determined. An addition to the tax of 50 per cent for fraud was determined. The petitioner assigns errors in the disallowance of the claimed deductions for expenses and repairs and in the addition to tax for fraud. The respondent on brief concedes the fraud issue. The petitioner on brief attacks the respondent's adjustment of the net operating loss, an issue which is not raised in the petition and hence is not before us for decision. The petitioner's brief does not discuss *102 the issues raised in the petition, nor was evidence adduced at the hearing to support the deductions claimed. Accordingly, the respondent is sustained as to the deficiency in tax. Attorneys' Fees Nate and Ben Miller claimed deductions in 1946 for $10,250 in attorneys' fees which deductions the respondent disallowed. Ten thousand dollars was paid counsel in connection with the indictment of these petitioners for violation of ceiling price laws and $250 for services in the matter of a minor O.P.A. violation not of a criminal character. Allowance of these payments as deductions is against public policy. See C. W. Thomas, 16 T.C. 1417 (1951); Anthony Cornero Stralla, 9 T.C. 801 (1947), and cases there cited. The case of Greene Motor Co., 5 T.C. 314 (1945) cited by the petitioners, is not in point as it involved a compromise payment and no plea or conviction in criminal proceedings. The respondent did not err in disallowance of these claimed deductions. Fraud The respondent determined 50 per cent additions to the tax for fraud in every case. On *103 brief respondent concedes this issue in the cases of Pauline, Sylvia and Leona Miller, and Best-Ever Packing Company. As a result of our holding in the Union Feed Yards, Inc., case, there is no basis for the additions to tax asserted against that corporation. The burden of proof as to fraud is upon the respondent. Section 1112, Internal Revenue Code of 1939. Fraud must be proved by affirmative and convincing evidence. Although we consider the evidence sufficiently shows that Adolph Miller, the managing and controlling stockholder and officer of Packing authorized and sanctioned, if he did not originate and direct, the collection of overceiling prices on meat of the corporation, we are unable to find from the evidence that the deficiencies in the case of Packing were in any part due to fraud with intent to evade tax. The question whether such collections were income to the corporation was not free from doubt. Accordingly, the additions to tax are not sustained as to Union Packing Company. For the same reason although Adolph omitted to report overceiling collections and other amounts deemed *104 constructive dividends from the corporations, we do not find the evidence sufficient to establish that the deficiencies in the case of Adolph Miller were in any part due to fraud with intent to evade tax. Nor is the evidence sufficient to show that the deficiencies in the case of Union Stock Farms were in any part due to fraud with intent to evade tax. The adjustments we have upheld concerned matters over which reasonable persons might differ and the amounts thereof were not large. The additions to tax for fraud as to this corporation are not sustained. In the cases of Nathan and Benjamin Miller, the respondent determined deficiencies and additions to tax for fraud upon the basis that the overceiling collections were income to them and their wives. The determination was made as a protective measure in accordance with the respondent's alternative position that if this income was not taxable to Packing it was taxable to these individuals. The petitioners on brief do not contest the additions to tax for fraud as to Nate and Ben. However, since we have sustained the respondent's determination that the collections involved were taxable as income to the corporation, it appears that *105 there will be no deficiencies in these cases and therefore no basis for additions to the tax for fraud. This may be determined in a computation under Rule 50. Decision will be entered for the respondent in Docket No. 32714. Decisions will be entered for the petitioner in Docket Nos. 29100, 29581 and 32713. Decisions will be entered under Rule 50 in Docket Nos. 29579, 32711, 45704, 29099, 29580, 32712, 29101, 29582, 32709, 29583, 32710, 29104, 29586, 29105, 29587, 29102, 29584, 29103 and 29585. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Union Packing Company, Docket Nos. 32711, 45704; Union Stock Farms, Docket Nos. 29099, 29580, 32712; Union Feed Yards, Inc., Docket Nos. 29100, 29581, 32713; Best-Ever Packing Company, Docket No. 32714; Adolph Miller, Docket Nos. 29101, 29582, 32709; Pauline Miller, Docket Nos. 29583, 32710; Benjamin Miller, Docket Nos. 29104, 29586; Sylvia Miller, Docket Nos. 29105, 29587; Nathan Miller, Docket Nos. 29102, 29584; Leona Miller, Docket Nos. 29103, 29585.↩
*. The year "1943" was substituted for "1942" pursuant to Official Order of the Tax Court, dated November 23, 1955, and signed by Judge Tietjens↩.
*. Year changed from 1955 to 1945 by official Order of Tax Court, dated December 7, 1955, and signed by Judge Tietjens↩.